1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9
10

11   CYPRESS INSURANCE COMPANY, as    )   Case No. 2:17-cv-00467-RAJ
     subrogee of Microsoft Corporation )
12                                      )   **PLAINTIFF CYPRESS INSURANCE**
                      Plaintiff,        )   **COMPANY'S TRIAL BRIEF**
13                                      )
             vs.                        )
14                                      )
                                        )
15   SK HYNIX AMERICA INC.              )
                                        )
16                    Defendant.        )
     _____)

17
18       Plaintiff, Cypress Insurance Company ("Cypress"), as subrogee of Microsoft Corporation

19   ("Microsoft"), by counsel, and for its Trial Brief hereby states as follows:

20
21
22
23
24
25
26
27
28

CYPRESS' TRIAL BRIEF

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1

# **TABLE OF CONTENTS**

2

INTRODUCTION...........................................................................................................1

3

STATEMENT OF FACTS............................................................................................3

4

A. The Agreement and the Ninth Amendment ............................................................3

5

1. Hynix Was Obligated to Supply DRAM Chips to Microsoft and to Not Discontinue or Restrict the Supply of Dram Chips to Microsoft ..............................................................4

6

7

2. Hynix Was Obligated to Allocate DRAM Chips to Meet Microsoft's Then-Current Forecasts and was Obligated to Notify Microsoft of a Capacity Constraint and to Reject Microsoft's Purchase Orders based on a Capacity Constraint ............................................5

8

9

3. Hynix Was Obligated to Provide Microsoft Priority Allocation in the Event of a Capacity Constraint...............................................................7

10

4. Hynix Was Obligated to Maintain Sufficient Buffer Inventory......................................7

11

5. Hynix Was Obligated to Maintain a Written Disaster Recovery Plan to Ensure the Supply of 2133 MHz Chips to Microsoft in the Event of a Disruption............................8

12

13

6. Hynix Was Obligated to Apply Pricing for the 2133 MHz Chips in accordance with the Pricing Table.......................................................9

14

7. Hynix Was Obligated to Meet the Capacity Requirements for the 2133 MHz Chips in accordance with the Capacity Table .....................................9

15

B. The Fire and Microsoft's Claim to Cypress ..........................................................16

16

C. Hynix's 2013 DRAM Production Capabilities and Sales ......................................12

17

D. Microsoft's Forecasts and Purchase Orders for 2133 MHz Chips, and Hynix's Insufficient Supply of 2133 MHz Chips to Microsoft..............................................13

18

E. Microsoft's Damages............................................................................................14

19

ANALYSIS ...............................................................................................................16

20

A. Hynix Breached the Agreement and Ninth Amendment in Multiple Ways and Failed to Use Commercially Reasonable Efforts to Supply 2133 MHz Chips to Microsoft ...........16

21

1. Hynix Breached the Agreement and Ninth Amendment and Acted Commercially *Unreasonably* by Failing to Maintain the Required Buffer Inventory .........................17

22

2. Hynix Breached the Agreement and Acted Commercially *Unreasonably* by Failing to Maintain a Written Disaster Recovery Plan ...............................................18

23

3. Hynix Breached the Agreement and Ninth Amendment and Acted Commercially *Unreasonably* by not Giving Microsoft Priority Allocation of 2133 MHz Chips..........19

24

25

4. Hynix Breached the Agreement and Ninth Amendment as Was Commercially *Unreasonable* by Failing to Meet Microsoft's Then Current Forecast, Failing to Notify

26

27

28

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Microsoft of a Capacity Constraint and Failing to Reject Microsoft's Purchase Orders Based on a Capacity Constraint ...................................................................23

5. Hynix Breached the Agreement and Ninth Amendment and was Commercially *Unreasonable* by Overcharging Microsoft for Chips in Contravention of the Ninth Amendment's Pricing Table............................................................................24

6. Hynix Acted in a Commercially *Unreasonable* Manner in Fulfilling its Contractual Obligations of the Agreement and Ninth Amendment ....................................25

B. Hynix's Affirmative Defenses Are Inapplicable...................................................31

1. Cypress was not a Voluntary Payor.............................................................31

2. The Commercial Impracticability Doctrine is Inapplicable ...........................35

3. Pre-Incident Conduct Is Not Relevant to Cypress' Breach of Contract Causes of Action....................................................................................................37

4. Hynix's Unclean Hands Defense in Not Relevant to Cypress' Breach of Contract Causes of Action......................................................................................37

CONCLUSION ......................................................................................................38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

# TABLE OF AUTHORITIES

## Cases

*Bank of America, N.A. v. Prestance Corp.*, 160 P.2d 560 (Wash. 2007) ........................................ 32

*Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245 (N.D. Ill. 1974), *aff'd,* 522 F.2d 469 (7th Cir. 1975) ..................................................................................................................... 36

*Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912 (E.D. Cal. 2010) ............................. 16

*Clow v. Nat'l Indem. Co.*, 54 Wash.2d 198, 339 P.2d 82 (1959) ................................................. 33

*Delgado v. United Facilities, Inc.*, 2012 WL 10717266 (E.D. Cal.) ............................................ 20

*Discovery Property and Casualty Ins. Co. v. Blair*, 2014 WL 4412339 (C.D. Cal.) ..................... 20

*Hartford Ins. Co. v. Ohio Cas. Ins. Co.*, 189 P.3d 195 (Wash. App. 2008) ............................ 32, 33

*In re Corbin*, 506 B.R. 287 (W.D. Wash. 2014) ......................................................................... 31

*In re Darosa*, 318 B.R. 871 (9th Cir. 2004) ................................................................................ 31

*In re Hamada*, 291 F.3d 645 (9th Cir. 2002) .............................................................................. 31

*International Marine Underwriters v. ABCD Marine, LLC*, 179 Wash.2d 274 (2013) ................. 19

*Jacob's Meadow Owners Association v. Plateau 44 II, LLC*, 139 Wash.App. 743, 162 P.3d 1153 (2007) .............................................................................................................................. 33, 35

*Lehrer v. DSHS, 101,* 5 P.3d 722 (2000) ..................................................................................... 16

*Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 123 Wash. 2d 678 ................................... 20

*Mahler v. Szucs*, 957 P.2d 632 (Wash. 1998) ............................................................................. 31

*Martin v. Hickenlooper*, 59 P.2d 1139 (Utah 1936) .................................................................... 31

*Metro. Life Ins. Co. v. First Sec. Bank of Idaho*, 491P.2d 1261 (Idaho 1971) .............................. 31

*Mount Vernon Dodge, Inc. v. Seattle National Bank*, 570 P.2d 702 (Wash. App. 1977) .............. 16

*Mutual of Enumclaw Ins Co. v. USF Insurance Co.*, 191 P. 3d 866 (Wash. 2008) ................. 31, 32

*Newcomer v. Masini*, 45 Wash.App. 284, 724 P.2d 1122 (1986) ................................................ 33

*Northwest Land & Investment, Inc. v. New West Federal Savings and Loan Association*, 786 P.2d 324 (Wash. App. 1990) ................................................................................... passim

*Riensche v. Cingular Wireless LLC*, C06-1325Z, 2007 WL 3407137 (W.D. Wash. Nov. 9, 2007), *vacated,* 320 Fed. Appx. 646 (9th Cir. 2009) .............................................................. 2

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

*Security State Bank v. Burk, et al.*, 100 Wash. App. 94, 995 P.2d 1272 (2000) ............................ 16

*Syrovy v. Alpine Resources, Inc.*, 841 P.2d 1279 (Wash. App. Div. 3 1992), *aff'd,* 859 P.2d 51 (Wash. 1993) ............................................................................................................................ 36

*Trinity Universal Ins. Co. of Kansas v. Ohio Casualty Ins. Co.*, 312 P.3d 976 (Wash. App. 2013) ................................................................................................................................................ 31

*Wm. Dickson Co. v. Pierce Cty,* 116 P. 3d 409 (Wash. App. 2005) ................................................ 20

*Zenwork, Inc. v. Avalara, Inc.*, 2017 WL 4167986 (W.D. Wash. 2017) ................................. 19, 20

**Other Authorities**

73 Am. Jur. 2d Subrogation § 5 ...................................................................................................... 32

83 C.J.S. Subrogation § 11 ............................................................................................................. 31

WPI 301.05 – Contract Interpretation ............................................................................................ 19

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

**INTRODUCTION**

SK Hynix America, Inc. ("Hynix") breached the Component Purchase Agreement ("Agreement") and Ninth Amendment to the Agreement with Microsoft in multiple ways and acted commercially *unreasonably* in violation of its numerous contractual obligations.  Hynix failed to maintain the required buffer inventory of 2133 MHz chips as a matter of law.  Hynix failed to have a written disaster recovery plan as a matter of law.  Hynix failed to supply the chips forecasted and ordered by Microsoft in accordance with the contract, and failed to not discontinue or restrict the supply of chips to Microsoft.  Hynix failed to give Microsoft ███ allocation of 2133 MHz chips after the September 4, 2013 fire at Hynix's Wuxi facility, despite having more than enough 2133 MHz chips to supply Microsoft.  Hynix never informed Microsoft that Hynix also contractually guaranteed ████ allocation to several of its other customers, while agreeing to provide super ████ to one of its customers.  Instead, Hynix categorized or "binned" 2133 MHz chips, which could and should have been allocated to Microsoft, as lower speed chips and sold them to Hynix's other customers for higher prices than the ones it was contractually bound with Microsoft.

In addition, Hynix failed to meet Microsoft's forecast at the time of the fire for 2133 MHz chips and failed to reject Microsoft's timely issued purchase orders for tens of millions of 2133 MHz chips despite now claiming that it knew that it could not fulfill those orders. Likewise, Hynix failed to notify Microsoft of any alleged capacity constraint restricting the supply of DRAM 2133 chips prior to the fire, despite now claiming that a capacity constraint existed prior to the fire (and allegedly was known at the time of the negotiations for the Ninth Amendment). Hynix also took further advantage of its position following the fire by charging Microsoft in the fourth quarter of 2013 an increased price per chip on nearly █████ of the much needed 2133 MHz chips even though Microsoft had outstanding purchase orders Hynix

CYPRESS' TRIAL BRIEF - 1

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

had not timely filled. In addition, Hynix acted in this manner despite trying to increase its market share of Microsoft's business and while identifying itself as Microsoft's launch partner for the Xbox One.

Hynix's numerous breaches of contract and commercially *unreasonable* conduct forced Microsoft to obtain substitute or cover 2133 MHz chips from alternative suppliers at substantially higher prices, resulting in total cover damages in excess of $97,714,253,[1] in order to avoid incurring far greater significant business interruption losses had Microsoft not timely launched the Xbox One. Cypress, as subrogee of Microsoft, is entitled to these damages.

Furthermore, Hynix's affirmative defenses have no merit. With regard to Hynix's voluntary payment defense, it is inapplicable under the facts and well established law. Cypress paid Microsoft's claim because its insurers concluded in good faith after a competent, standard in the industry investigation that it was a covered claim, and Cypress had a contractual obligation to make payment based on the policy, the facts, and the law. Cypress therefore is not, and cannot be, a voluntary payor. In fact, even if all of Hynix's allegations were true, the voluntary payment defense would still fail since an insurer, under Washington law, is only a voluntary payor if the insurer pays a claim *knowing* that the claim was not covered. *Riensche v. Cingular Wireless LLC*, C06-1325Z, 2007 WL 3407137, at *9 (W.D. Wash. Nov. 9, 2007), *vacated,* 320 Fed. Appx. 646 (9th Cir. 2009)(unpublished; reversed on other grounds). As this court has already noted, Cypress and the Reinsurers evaluated the loss and concluded that it was covered prior to paying the claim. Therefore, as a matter of law, Hynix's voluntary payor defense must fail.

Similarly, the doctrines of commercial impracticability and frustration of purpose have no applicability, because the Parties clearly contemplated the possibility of a foreseeable event

---

[1] These include some DRAM chips from Hynix at prices above the pricing set forth in the Ninth Amendment.

CYPRESS' TRIAL BRIEF - 2

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

such as a fire and planned accordingly in the contract by requiring, among other things, Hynix to have a buffer inventory (which this Court has concluded Hynix breached) and a written disaster recovery plan to address a force majeure or other similar disruption (which this Court has also concluded Hynix breached).   Moreover, the evidence shows that Hynix made more than sufficient 4Gb DRAM chips to supply the contractually required 2133 MHz chips to Microsoft, but decided instead to allocate those chips into 1866 MHz and 1600 MHz chips and sell them at higher prices to other customers, thereby putting its own pecuniary interests ahead of its contractual obligations and the best interests of its launch partner, Microsoft.   Further, Hynix will be unable to meet its additional burden of proving that the fire was not its fault.

Finally, Hynix's defense that Microsoft's own conduct caused its damages has no merit. Those allegations relate to pre-incident conduct, which are not relevant to this breach of contract action.   Moreover, comparative fault is not applicable in a breach of contract claim, and Microsoft did not breach any provision of the Parties' contract.   As such, Hynix's affirmative defenses are inapplicable, and it is liable to Cypress for its multiple breaches of contract and commercially *unreasonable* conduct resulting in damages up to approximately $98 million.

## STATEMENT OF FACTS

### A.   The Agreement and the Ninth Amendment

On August 19, 2004, Microsoft and Hynix entered into the Agreement.   The Agreement was amended on April 1, 2013 and extended until August 19, 2014 with the Ninth Amendment. The Agreement and the Ninth Amendment form the basis of Cypress' breach of contract claim in this case, and they establish the terms and conditions under which Hynix agreed to sell certain DRAM chips to Microsoft, which were essential for the launch of Microsoft's new Xbox One gaming console to be rolled out during the 2013 holiday season.

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1.    **Hynix Was Obligated to Supply DRAM Chips to Microsoft and to Not Discontinue or Restrict the Supply of Dram Chips to Microsoft**

Paragraph 1.1 of the Agreement provides:



The Ninth Amendment provides in Paragraph 2 that "[t]he attached Exhibit A is added to the Agreement."  Exhibit A of the Ninth Amendment identifies the Product to be supplied in Paragraph 1.1 and provides:

**EXHIBIT A**
**1.    4Gb DDR3 1.5V PRODUCTS**
**PRODUCT, LEAD TIME AND PRICES**
**TABLE 1**
**Product Table**

| Microsoft Part Number* | Detailed Description | Mfg Part No. | Warranty Period | Lead Time (First P.O./Standard) | Microsoft Device*** | Approved Manufacturing Facilities | Required Level of Buffer Inventory | Incoterm 2010 and/or Port of Entry** |
|---|---|---|---|---|---|---|---|---|
| TBD | 4Gb DDR3 1.5V x16 2133MHz | H5TQ4G63A FR-TEC | 1 year from the date of delivery | ██████ | Microsoft Hardware Device | Fab:  M10 Address: 2091 Gyeongch ung-daero Bubal-eub Incheon-si Gyeonggi -do, Korea | 2 weeks of then current Forecast | DDU Hong Kong |

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

The terms of this Exhibit A only apply to purchases of the Product identified in the Product Table (Table 1) for the Microsoft Device listed in such Product Table.

Thus, the specific product Hynix agreed to supply to Microsoft pursuant to the Ninth Amendment was 4Gb DDR3 1.5V x16 2133 MHz DRAM CHIPS (hereinafter referred to as "2133 MHz chips").

Pursuant to the above provisions of the Agreement and Ninth Amendment, Hynix agreed that it would not discontinue the manufacture of 2133 MHz chips necessary for the launch of the Xbox One. Hynix further agreed that it would not restrict the supply of 2133 MHz chips except as noted in Exhibit A of the Ninth Amendment, and that Hynix would provide an uninterruptible supply of 2133 MHz chips to Microsoft.

**2.    Hynix Was Obligated to Allocate DRAM Chips to Meet Microsoft's Then-Current Forecasts and was Obligated to Notify Microsoft of a Capacity Constraint and to Reject Microsoft's Purchase Orders based on a Capacity Constraint**

Paragraph 4.2 of the Agreement provides:



The Ninth Amendment further defines the obligations of the parties with respect to Forecasts and Purchase Orders as related to the 2133 MHz chips and provides:



CYPRESS' TRIAL BRIEF - 5

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000



In accordance with the terms of the Agreement and the Ninth Amendment, Microsoft issued regular six-month rolling forecasts to Hynix and purchase orders against those forecasts for the 2133 MHz chips.  Specifically, on June 5, 2013, Microsoft issued to Hynix a forecast for approximately ███████ 2133 MHz chips, and on June 20, 2013, Microsoft issued to Hynix a forecast for approximately ████████ 2133 MHz chips for the third and fourth quarters of 2013.  Thereafter, on August 8, 2013, Microsoft issued to Hynix a forecast for approximately ██ ███████ 2133 MHz chips for the period through January 2014.  Following the issuance of the rolling forecasts, Microsoft placed purchase orders to Hynix consistent with those forecasts requesting delivery no earlier than the eight week lead time required in the contract.

Paragraph 4.2 of the Agreement and 4.1 of the Ninth Amendment also required ████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████  At no time did Hynix notify Microsoft of any capacity constraint prior to the fire, and Hynix never rejected *any* purchase orders from Microsoft based on a capacity constraint.  As such, pursuant to the terms of the Contract, Hynix agreed that it would fulfill Microsoft's purchase orders that were placed against the issued forecasts in June and August 2013.

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

3.   **Hynix Was Obligated to Provide Microsoft ███████ Allocation in the Event of a Capacity Constraint**

Paragraph 4.2 of the Agreement further provides that "███████████████████ ██████████████████████████████████████" According to Microsoft's representatives, ██████ allocation means that Microsoft had the ability to receive as many products as Hynix could produce to fulfill its purchase orders in the event of a capacity constraint, and that if the supplier had to make choices based on limited availability of product, they had to provide that product to Microsoft.

Prior to the fire on September 4, 2013, Hynix did not advise Microsoft that other customers of Hynix also received "██████ allocation" of DRAM chips if there was a capacity constraint. This was despite the fact that numerous large strategic customers of Hynix contained similar or identical "██████ allocation" of product provisions in their contracts. In other words, Hynix contractually obligated itself similarly with many customers and even provided one customer with a super "██████ allocation", thereby providing product to that customer before all others. Yet, Hynix advised Microsoft prior to this lawsuit that other customers received the same or more favorable ██████ allocations advantages.

4.   **Hynix Was Obligated to Maintain Sufficient Buffer Inventory**

Paragraph 7 of the Agreement provides:



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

[REDACTED]

Buffer inventory is the general standard practice in the supply chain to establish an inventory to absorb variations in demand or product consumption.  The Agreement and Exhibit A of the Ninth Amendment required Hynix to maintain a buffer inventory based upon "[REDACTED]

[REDACTED]."  Thus, the Agreement and Ninth Amendment required Hynix to maintain a buffer inventory of [REDACTED] MHz chips at the time of the fire on September 4, 2013.

*This Court has ruled as a matter of law that Hynix breached the Agreement and Ninth Amendment by not having the required buffer inventory.*

> **5.    Hynix Was Obligated to Maintain a Written Disaster Recovery Plan to Ensure the Supply of 2133 MHz Chips to Microsoft in the Event of a Disruption**

Paragraph 12.1 of the Agreement provides:



A disaster recovery plan consists of multisource capabilities, multiple locations for production of parts, multiple freight and logistic suppliers, and redundancies where possible to provide mitigations that are in place to recover from a disruption or disaster such as the Wuxi fab fire of September 4, 2013.   *The Court has ruled as a matter of law that Hynix breached the Agreement and Ninth Amendment by not having the required written disaster recovery plan.*

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

**6.      Hynix Was Obligated to Apply the Pricing for the 2133 MHz Chips in accordance with the Pricing Table**

Table 2 Pricing Table of the Ninth Amendment provides:



**TABLE 2**
**Pricing Table**

| Q2'13 | | | Q3'13 | | | Q4'13 | | |
|---|---|---|---|---|---|---|---|---|
| | ███ | | | ███ | | | ███ | |

Hynix provided ██████████ MHz DRAM chips to Microsoft at ████ per chip in the fourth quarter of 2013, which was a price higher than the ████ per DRAM chip provided for in Table 2, in violation of the Ninth Amendment.  Importantly, at that time, Microsoft had issued purchase orders that had not been fulfilled by Hynix.  Since Hynix had a contractual obligation to provide these DRAM chips to Microsoft at the contract price, it was improper for Hynix to demand a higher price simply because Microsoft was desperate and Hynix claimed that such chips had been promised to another customer.  Interestingly, Hynix does not identify this mystery customer.  Further, Hynix had only sold ████ 2133 MHz chips to customers other than Microsoft during the period of January, 2013 through August 2013.

**7.      Hynix Was Obligated to Meet the Capacity Requirements for the 2133 MHz Chips in accordance with the Capacity Table**

Table 3 Capacity Table of the Ninth Amendment provides:



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000



**TABLE 3**
**Capacity Table – Millions of Product Units**

| Q2'13 | Q3'13 | Q4'13 |
|---|---|---|
| ██ | ██ | ██ |

The Capacity Commitment section was added following joint negotiations between Microsoft and Hynix to ensure ***the minimum amount of capacity*** or amount of product that Hynix was able to deliver to launch the Xbox One.  As such, Table 3 represents the minimum capacity commitment of ***at least*** ██████ 2133 MHz chips in 2013 that Microsoft was expecting from Hynix.  Note that the Agreement was not drafted as a "maximum" contract and that Microsoft was entitled to order more than ██████ chips.  By way of comparison, the Agreement between Microsoft and Micron limits the quantity of chips Microsoft can obtain to ██████ chips per month.  Hynix certainly could have requested similar language if it wanted to be limited to a certain quantity for any given period.  During negotiations of the Ninth Amendment, Hynix attempted to insert a provision which required Microsoft to secure Hynix approval for purchase orders above the ██████.  Microsoft rejected that language and it was not included in the final version.  The Ninth Amendment required that Hynix use commercially reasonable efforts to meet this minimum ██████ 2133 MHz chip commitment.

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

As a practical matter, the Capacity Table of the Ninth Amendment works in conjunction with the other provisions in the Agreement and the Ninth Amendment, which must be read together.  Under the terms of the contract, Microsoft issue rolling six-month forecasts to Hynix for 2133 MHz chips.  In turn, Hynix is required to allocate manufacturing capacity in amounts sufficient to manufacture the 2133 MHz chips in sufficient quantity to meet those forecasts.  Microsoft then issues purchase orders against those rolling forecasts to Hynix, and Hynix may not reject those any purchase orders that comply with the Agreement.  Hynix must also use commercially reasonable efforts to provide the 2133 MHz chips to Microsoft to meet the requirements of the Capacity Table, or at a minimum, ███████ MHz chips.

**B.**     **The Fire and Microsoft's Claim to Cypress**

On September 4, 2013, the fire occurred at Hynix's Wuxi fabrication facility.  The cause of the fire was the improper purging of a piping system at the Wuxi facility using flammable hydrogen gas rather than nitrogen gas.  According to Hynix, the fire "instantly reduced worldwide DRAM supply by 15 percent and brought Hynix's operations to its knees."  Hynix made a claim to its own property insurer for losses it sustained due to the fire.  Hynix's claimed ███████ for its financial losses sustained as a result of the fire based upon the loss of capacity to produce wafers at the Wuxi.

Cypress insured Microsoft under Policy No. 1005 for contingent time element losses.  Microsoft made a claim to Cypress in excess of $175 million, resulting in payment of the contingent time element sub-limit of $150 million for its contingent time element losses arising out of the fire.  The Cypress policy contained a $25 million deductible borne by Microsoft and is also included in this recovery action.  Microsoft's losses included cover damages to obtain substitute 2133 MHz chips from other suppliers because of Hynix's failure to provide the

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

required 2133 MHz chips under the Agreement and Ninth Amendment as well as incremental

freight charges and additional costs.  Insurance professionals adjusted and paid the loss less

Microsoft's $25 million deductible because Microsoft's claim was covered under the Policy.

### C.   Hynix's 2013 DRAM Production Capabilities and Sales

The Ninth Amendment mandated that the 2133 MHz chips at issue in this case were to

be manufactured at Icheon.  Hynix, however, manufactured DRAM chips at its fabrication

facilities in Wuxi and Icheon without alerting Microsoft to the fact that the majority of the

DRAM chips were not manufactured at the contractual location.

As to production capabilities, various characteristics of DRAM chips are produced from

the same wafer.  Thus, chips from the same wafer may have different speed characteristics such

as 2133, 1866, or 1600.  A process known as "binning" occurs near the end of the ▮▮▮▮

manufacturing cycle at which time the chips are graded for their various characteristics,

including speed.  The binning process is such that higher performing chips such as 2133 MHz

chips can always be downgraded for sale as lower speed chips such as 1866 MHz or 1600 MHz.

Production data and yield percentages establish that Hynix manufactured approximately

▮▮▮▮▮▮ 4Gb DDR3 DRAM chips at its two facilities in 2013 even with the impact of the

fire.  At least ▮▮▮ of those chips qualified as 2133 MHz chips for a total of ▮▮▮▮▮ 2133

MHz chips – far more 2133 MHz chips than Microsoft ordered from Hynix for the Xbox One

launch. Given the actual production at the two Hynix facilities, Hynix produced more than

sufficient numbers of 2133 MHz chips to meet Microsoft's forecasts and purchase orders.

Importantly, the production data prior to the fire demonstrates that Hynix allocated ▮▮▮▮ of its

DDR3 DRAM production as 2133 MHz chips at Wuxi.  The data also reflects that Hynix

allocated ▮▮▮▮ of the DDR3 DRAM production as 2133 MHz chips at Icheon after the fire.  If

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Hynix had allocated those same percentages to Microsoft throughout 2013, Hynix could have provided in Microsoft between ███████████████ chips, even given the fire and between ██████████████████ chips had the fire not occurred.

In addition, sales data and records for 2133, 1866, and 1600 MHz chips establish that from June through December 2013 Hynix sold tens of millions of chips to its other customers as 1866 and 1600 MHz chips, which Hynix could have sold to Microsoft as 2133 MHz chips, thereby satisfying all of Microsoft's orders to timely meet the Xbox One launch.  The records and data also show that the average selling price of a 2133 MHz chip from Hynix to Microsoft was ████, while the average selling price of an 1866 MHz chip from Hynix to its customers was ████.  In addition, the average selling price of a 1600 MHz chip from Hynix to its customers was ████.

**D.   Microsoft's Forecasts and Purchase Orders for 2133 MHz Chips, and Hynix's Insufficient Supply of 2133 MHz Chips to Microsoft**

Microsoft timely issued purchase orders to Hynix for 2133 MHz chips with delivery dates in 2013 for ████████ chips.  In August 2013, Microsoft also provided Hynix with a six month forecast of 2133 MHz chip requirements for the period July 22, 2013 through January 27, 2014 with forecasted 2133 MHz chip requirements of ████████.  Hynix never rejected any of Microsoft's purchase orders and did not notify Microsoft of any capacity constraint prior to the fire on September 4, 2013.

For its part, Hynix supplied only ████████████ MHz chips to Microsoft from June to December 2013 at the prices set forth in the Ninth Amendment: ████████ chips less than the Ninth Amendment minimum capacity commitment; ███████ chips less than Microsoft's purchase orders; and ██████ chips less than Microsoft's forecast.  In addition, The Ninth Amendment provides that in the fourth quarter of 2013, Hynix was to supply 2133 MHz chips to

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Microsoft at the price of ███ per chip.  However, Hynix sold ███████ MHz chips to Microsoft during that time period at the inflated price of ████ per chip.

### E.    Microsoft's Damages

Because of the shortfall of 2133 MHz chips from Hynix due to the fire, Microsoft was forced to obtain substitute or cover 2133 MHz chips from alternative suppliers, which were purchased at substantially higher costs.  Cypress paid Microsoft total cover damages of $97,714,253 for increased chip costs.

At trial, Cypress intends to present five iterations of recoverable cover damages based on various chip quantities, which are based upon the claims of Microsoft and the defenses of Hynix. These iterations are as follows:

- Iteration No. 1 – based upon Hynix's defense that Cypress is only entitled to recover for ██████ 2133 MHz DRAM chips pursuant to the Capacity Table in the Agreement and the Ninth Amendment for total damages of $32,516,776.

- Iteration No. 2 – based upon the purchase orders issued by Microsoft for total damages of $62,857,329.

- Iteration No. 3 – based upon the August 8, 2013 forecast issued by Microsoft to Hynix for total damages of $77,013,226 (which includes the Iteration No. 2 purchase orders issued for $62,857,329).

- Iteration No. 4 – based upon amounts paid by Cypress under its policy for increased chip costs due to the fire, which includes increased costs resulting from Microsoft having to enter into a long-term contract with Samsung at undesirable terms for total damages of $97,714,253.

CYPRESS' TRIAL BRIEF - 14

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

- <u>Iteration No. 5</u> – based upon the failure of Hynix to maintain a buffer inventory for damages of $28,441,611.

The above iterations include ████████ that Microsoft incurred in increased costs to obtain ████████ chips from Samsung at prices between ████████ per chip, as well as ████████ in increased costs to obtain ████ million chips from Micron at ████████ per chip.  Additionally, as a condition of timely providing the chips to Microsoft in 2013 for a timely Xbox One launch, Samsung required Microsoft to purchase additional chips in 2014 at the price of between ████████ per chip.  Further, Hynix itself required Microsoft to pay ████ rather than the contractually agreed price of ████ per chips for ████████ 2133 MHz chips that equated to an additional ████████ in costs to Microsoft.

Microsoft also incurred incremental freight charges and other additional costs in the amount of $77,285,747.  The Court has ruled as a matter of law that recovery of the incremental freight charges and other additional costs is not recoverable in this lawsuit based upon the limitation of liability for consequential damages in the Ninth Amendment.  Nevertheless, Microsoft incurred all of these costs as mitigation costs: Had Microsoft not incurred these costs to timely launch the Xbox One, the financial losses to Microsoft would have been in excess of $588 million.

Therefore, Cypress is entitled to recover $97,714,253 in damages at trial which represents the total cover damages sustained by Microsoft for obtaining substitute or cover 2133 MHz chips.

CYPRESS' TRIAL BRIEF - 15

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

# ANALYSIS

A.   **Hynix Breached the Agreement and Ninth Amendment in Multiple Ways and Failed to Use Commercially Reasonable Efforts to Supply 2133 MHz Chips to Microsoft**

To succeed in a contract claim, a plaintiff must prove only a valid contract existed between the parties, the contract was breached, and the breach resulted in damage. *Lehrer v. DSHS, 101,* 5 P.3d 722 (2000).  Generally, the measure of damages for breach of contract is that the injured party is entitled to recovery of *all* damages naturally accruing from the breach, and to be put in as good a position as he would have been in had the contract been performed. *Northwest Land & Investment, Inc. v. New West Federal Savings and Loan Association*, 786 P.2d 324, 329-30 (Wash. App. 1990).  Washington Pattern Civil Jury Instruction 303.01 provides: "In calculating the plaintiff's actual damages, you should determine the sum of money that will put the plaintiff in as good a position as *[he] [she] [it]* would have been in if both plaintiff and defendant had performed all of their promises under the contract."  A plaintiff whose contract a defendant has breached is entitled to recover the amount of money which will reasonably and fairly compensate the plaintiff for *all* of the damages a jury finds were proximately caused by the breach of contract. *Id.* at 786 P.2d 328.

In addition, the issue of commercial reasonableness is factually driven and should be determined in light of all of the facts and in particular those known and understood by the parties during the performance of their contractual duties. *See Security State Bank v. Burk, et al*., 100 Wash. App. 94, 101, 995 P.2d 1272, 1277 (2000); *see also Mount Vernon Dodge, Inc. v. Seattle National Bank*, 570 P.2d 702, 712 (Wash. App. 1977); *see also Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 923-928 (E.D. Cal. 2010)(totality of circumstances is examined in

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

determining the factual issue of whether party exercised commercially reasonable efforts under the contract).

In this case, the evidence overwhelmingly establishes that Hynix breached the Agreement and Ninth Amendment in multiple ways and did not use commercially reasonable efforts to supply the requisite number of 2133 MHz chips to Microsoft. Because of these breaches and Hynix's commercially *unreasonable* conduct, Microsoft incurred substantial damages which Cypress, as Microsoft's subrogee, is entitled to recover.

**1.      Hynix Breached the Agreement and Ninth Amendment and Acted Commercially *Unreasonably* by Failing to Maintain the Required Buffer Inventory**

Buffer inventory is the standard practice in the supply chain to establish an inventory to absorb variations in demand or product consumption. The Agreement and Exhibit A of the Ninth Amendment required Hynix to maintain a buffer inventory based upon "█████████ ████████████" The then current forecast of weekly 2133 MHz chip requirements was sent by Microsoft to Hynix on August 8, 2013, which forecasted 2133 MHz chip requirements of █████ for the week of September 9, 2013 and ██████ for the week of September 16, 2013. Accordingly, the Agreement and Ninth Amendment required Hynix to maintain a buffer inventory of ██████ 2133 MHz chips at the time of the fire on September 4, 2013.

The Court has ruled as a matter of law that Hynix breached the Agreement and Ninth Amendment by not having the required buffer inventory. The only issue to be determined at trial is what amount of damages resulted from this breach. Based on the number of 2133 MHz chips that the contract required to be maintained in the buffer inventory by Hynix at the time of the fire, the damages sustained by Microsoft are ████████. Cypress is therefore entitled to

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

recovery of these damages, which accrued naturally from Hynix's breach of the Agreement and

Ninth Amendment. *See New West Federal Savings and Loan Association*, 786 P.2d at 329-30.

> **2.      Hynix Breached the Agreement and Acted Commercially *Unreasonably by* Failing to Maintain a Written Disaster Recovery Plan**

A typical disaster recovery plan consists of multisource capabilities, multiple locations

for production of parts, multiple freight and logistic suppliers, and redundancies where possible

to provide mitigations that are in place to recover from a disaster such as the fire of September 4,

2013.  The Agreement required Hynix to maintain such a plan.  The plain language of Paragraph

12.1 of the Agreement relating to the disaster recovery plan establishes that the Parties' foresaw

the possibility of a fire occurring and intended that Hynix address that foreseeable contingency

in advance through the disaster recovery plan.  The Court has ruled as a matter of law that Hynix

breached the Agreement and Ninth Amendment by not having the required written disaster

recovery plan.  Again, this is another example of commercially unreasonable conduct by Hynix

which resulted in Cypress' damages.  The only issue to be determined at trial is the amount of

damages that resulted from this breach.  Because of Hynix's failure to have a written disaster

recovery plan in place to ensure the uninterrupted flow of chips to Microsoft, Microsoft had to

obtain substitute or cover 2133 MHz chips from alternative suppliers, which were purchased at

substantially higher costs, as well pay Hynix an additional ▮▮▮▮▮ more for approximately

▮▮▮▮▮ chips that Hynix should have sold at the contractually agreed upon price of $▮

instead of ▮▮ per chip.

Additionally, if Hynix had an appropriate disaster recovery plan in place as required by

the contract, Hynix would have been able to provide Microsoft with all of the 2133 MHz chips

Microsoft ordered for the Xbox One launch, and Microsoft would have avoided having to pay

higher prices to Samsung for chips in 2014 in order to mitigate its damages.   Accordingly,

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Cypress is entitled to recover the $97,714,253 it paid Microsoft for these damages, which accrued naturally from its breach of the Agreement. *See New West Federal Savings and Loan Association*, 786 P.2d at 329-30.

> **3. Hynix Breached the Agreement and Ninth Amendment and Acted Commercially *Unreasonably* by not Giving Microsoft ███████ Allocation of 2133 MHz chips**

Paragraph 4.2 of the Agreement provides that "████████████████████████████████████████ ████████████████████████████████████" "██████ allocation" is not defined in the Agreement. Generally, contract interpretation is a question of law. *Zenwork, Inc. v. Avalara, Inc.*, 2017 WL 4167986, *2 (W.D. Wash. 2017). The Washington Supreme Court set forth the contractual interpretation rules in *International Marine Underwriters v. ABCD Marine, LLC*, 179 Wash.2d 274 (2013). During the interpretation process, "a court's primary goal is to ascertain the parties' intent at the time they executed the contract." *Id*. at 282. The Court previously ruled that the term "██████" is ambiguous. (ECF No. 195, pp. 12-13). Thus, according to the Court's ruling, extrinsic evidence of the term's meaning will be heard at trial, and the jury will be instructed to interpret the term priority as used in the contract consistent with WPI 301.05 – Contract Interpretation.

The extrinsic evidence shows that ██████ allocation meant that Hynix would provide Microsoft with as many 2133 MHz chips as it could produce – i.e., as Hynix had available – to satisfy Microsoft's demand in the event of a capacity constraint. It meant that, after the fire, if Hynix had to make chip allocation choices due to a limited amount of chip availability, Hynix needed to allocate all of those available chips to Microsoft. This is consistent with the contract viewed as a whole (including the buffer inventory and disaster recovery plan provisions), the specific contract language at issue, the normal meaning and usage of the term "██████," the

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1  facts and circumstances surrounding the making of the contract, the conduct of the parties, and

2  the reasonableness of the respective interpretations offered by Cypress versus that offered by

3  Hynix.

4          Microsoft's logical and reasonable interpretation is consistent with dictionary definitions

5  of the term "████," [2] of which courts may take judicial notice. [3]  Both definitions of "█████"

6  found in general use dictionaries address the specific situation that is at issue in this litigation –

7  the giving of precedence to Microsoft in times of shortage or allocation of product such as the

8  DRAM chips.  In other words, the plain, ordinary meaning of the phrase "████ allocation"

9  means that Microsoft had the right to precede others, "especially during a shortage" of supplies

10  and/or had the "top ████."  Any other interpretation of the phrase would render it

11  meaningless, particularly in view of the buffer inventory and disaster recovery plan contract

12  requirements.  If Hynix intended a definition other than the plain and ordinary meaning, it could

13  have requested that "████ allocation" be defined within the Agreement or Ninth Amendment.

14  Despite the ordinary and plain meaning that should have been given to the phrase "████

15  allocation" by Hynix, it did not supply all of the 2133 MHz chips to Microsoft that were

16  available to Hynix from September 4, 2013 to December 31, 2013 and into 2014, even though

17  Microsoft was the only customer purchasing significant quantities of these chips from Hynix.

18

19

20

21  [2] Dictionary definitions are often used by courts to assist in contract interpretation, and in some cases courts even take judicial notice of such definitions, so as to give words in a contract their ordinary, usual and popular meaning. *See Zenwork, Inc. v. Avalara, Inc.*, 2017 WL 8727856, *1 (W.D. Wash. 2017), *citing Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 123 Wash. 2d 678, 692; *see also Wm. Dickson Co. v. Pierce Cty.*, *supra.* at 493; *see also Delgado v. United Facilities, Inc.*, 2012 WL 10717266, *4-5 (E.D. Cal.); *see also Discovery Property and Casualty Ins. Co. v. Blair*, 2014 WL 4412339, 7-8(C.D. Cal.).

22

23

24  [3] Microsoft's interpretation is supported by the definition of "████ on the website Dictionary.com which provides that "priority" means: (1) the state or quality of using earlier in time, occurrence, etc.; (2) *the right to precede others in order, rank, privilege, etc.; precedence*; (3) *the right to take precedence in obtaining certain supplies, services, facilities, etc., especially during a shortage*; (4) something given special attention. (emphasis added).  In addition, the Merriam-Webster dictionary defines "████ as: 1    a (1): *the quality or state of being prior* (2): precedence in date or position of publication – used of taxa b (1); *superiority in rank, position, or privilege* (2): legal precedence over the same subject matter; 2 *preferential rating; especially: one that allocates rights to goods and services usually in limited supply • that project has top ████*.

25

26

27

28  CYPRESS' TRIAL BRIEF - 20

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Instead, Hynix allocated those DRAM chips to other similar strategic customers – not Microsoft – at lower speed grade DRAM chips, either 1866 MHz or 1600 MHz, and at considerably higher prices.  Microsoft's interpretation of the term "████" is supported by all of the relevant extrinsic evidence.

Hynix's interpretation is not supported and renders the term "████" and the promise it allegedly represented completely illusory.  When all of Hynix's large strategic customers were given similar "████ allocation" promises then the "████ allocation" to Microsoft ceased to exist and the contract term became meaningless.  This is particularly true where one of Hynix's large strategic customers – other than Microsoft – was granted super ████ allocation above all other Hynix customers (i.e., Hynix would satisfy all of that customer's orders before meeting any other customer's orders).

Hynix had more than sufficient production capability to supply the requisite number of 2133 MHz chips to Microsoft, but instead allocated those chips to its other large strategic customers for higher prices.  Production data and records establish that Hynix manufactured approximately ████ 4Gb DDR3 DRAM chips at its two facilities in 2013 and that at least ████ of those chips qualified as 2133 MHz, for a total of ████ 2133 MHz chips.  This quantity of chips was more than sufficient for Hynix to meet its contractual obligations to Microsoft.

Moreover, Hynix would have met its obligations to Microsoft if it simply continued to provide DRAM chips to Microsoft at the same rate that it did throughout the year.   Hynix's production data demonstrates that Hynix was able to provide ████ of its entire DDR3 DRAM production from Wuxi to Microsoft during August of 2013.  In addition, Hynix was able to provide ████% of its entire DDR3 DRAM production from Icheon to Microsoft during

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

December of 2013.  All of the production data supports one basic and undeniable fact – Hynix could have provided Microsoft with sufficient 2133 MHz chips to meet Microsoft's purchase orders and forecasts.

In addition, sales data and records for 2133, 1866, and 1600 MHz chips establish that from June through December 2013 Hynix sold tens of millions of chips to its other customers as 1866 and 1600 MHz chips.  These chips should have been sold to Microsoft as 2133 MHz chips in order to satisfy Microsoft's orders in order to timely meet the Xbox One launch. Instead of doing so, however, Hynix chose to sell the other binned DRAM chips at higher prices than the negotiated contract amount in the Agreement and Ninth Amendment.  Simply put, Hynix chose profit over its contractual obligations.

Hynix's own internal email correspondence supports that Hynix clandestinely made this allocation based on sales price choice in order to maximize its profits, rather than to fulfill its contractual obligations to Microsoft by giving it priority allocation of DRAM chips to satisfy Microsoft's orders for 2133 chips.  Customers of Hynix would also receive "████ allocation" of DRAM chips if there was a capacity constraint.  Hynix failed to disclose this critical information to Microsoft despite the fact that numerous large strategic customers of Hynix had similar or identical "████ allocation" of product provisions in their contracts with one customer having essentially a super "████ allocation" of product provision requiring its product to be provided above all other Hynix customers.

Hynix's conduct cannot be characterized as commercially "reasonable" with regard to the provision in the Agreement regarding ████ allocation.  Therefore, Cypress is entitled to the cover damages that it paid Microsoft in the amount of $97,714,253, which accrued naturally

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

from its breach of the priority allocation provision in Paragraph 4.2 of the Agreement. *See New West Federal Savings and Loan Association*, 786 P.2d at 329-30.

**4.      Hynix Breached the Agreement and Ninth Amendment and Was Commercially *Unreasonable* by Failing to Meet Microsoft's Then Current Forecast, Failing to Notify Microsoft of a Capacity Constraint and Failing to Reject Microsoft's Purchase Orders Based on a Capacity Constraint**

Paragraph 4.2 of the Agreement and Paragraph 4.1 of the Ninth Amendment required Hynix to supply Microsoft 2133 MHz chips according to Microsoft's then current forecast. Those provisions also required Hynix to notify Microsoft of any capacity constraint and to reject any purchase orders from Microsoft in the event of a capacity constraint.

Microsoft timely issued purchase orders to Hynix for 2133 MHz chips with delivery dates in 2013 for ██████ chips.  Microsoft also provided Hynix with a six month forecast of 2133 MHz chip requirements for the period July 22, 2013 through January 27, 2014 with forecasted 2133 MHz chip requirements of ██████.  At no time did Hynix notify Microsoft of any capacity constraint prior to the fire on September 4, 2013.  In the event that Hynix had a capacity constraint, Hynix was obligated to notify Microsoft and should have then rejected purchase orders at the time they were issued by Microsoft.  In breach of the Agreement and Ninth Amendment, Hynix supplied only ██████ 2133 MHz chips to Microsoft from June to December 2013 at the prices set forth in the Ninth Amendment: ██████ chips less than the Ninth Amendment minimum capacity commitment; ██████4 chips less than Microsoft's purchase orders; and ██████ chips less than Microsoft's forecast.

Hynix's deliberate and commercially unreasonable actions left Microsoft with a significant shortfall of 2133 MHz chips, while concealing from Microsoft its purported capacity constraint, which Hynix now contends was the reason of its inability and unwillingness to meet

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

its contractual obligations. As a result, Cypress is entitled to recover the amounts it paid Microsoft for increased chip costs in the amount damages of $97,714,253 which accrued naturally from its breaches of Paragraphs 4.2 of the Agreement and 4.1 of the Ninth Amendment. *See New West Federal Savings and Loan Association*, 786 P.2d at 329-30.

**5.     Hynix Breached the Agreement and Ninth Amendment and Was Commercially *Unreasonable* by Overcharging Microsoft for Chips in Contravention of the Ninth Amendment's Pricing Table**

The Table 2 Pricing Table of the Ninth Amendment provides:



**TABLE 2**
**Pricing Table**

| | Q2'13 | Q3'13 | Q4'13 |
|---|---|---|---|
| | ███ | ███ | ███ |

However, in contravention of this express pricing table, Hynix sold ███ 2133 MHz chips to Microsoft during the fourth quarter of 2013 at the inflated price of ███ per chip. Hynix's price gouging tactic, by taking advantage of Microsoft's predicament given the launch of the Xbox One for the 2013 Holiday season, was in breach of the Pricing Table of the Ninth Amendment and commercially *unreasonable*. At the time of this price increase, Hynix had outstanding Microsoft purchase orders that Hynix should have satisfied rather than charging Microsoft a counter-contractual premium. Indeed, the evidence establishes that while Microsoft agreed to the price per chip increase, it did so only because it had no choice given the impending Xbox One launch and its desperation to receive as many 2133 MHz chips as it could leading up

CYPRESS' TRIAL BRIEF - 24

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

to the launch.  Accordingly, Cypress is entitled to recover the increased costs of ▇▇▇ per chip or ▇▇▇▇▇▇ for the total ▇▇▇▇▇ received at the increased price, which accrued naturally from the breach of the Agreement and Ninth Amendment. *See New West Federal Savings and Loan Association*, 786 P.2d at 329-30.

6. **Hynix Acted in a Commercially *Unreasonable* Manner in Fulfilling its Contractual Obligations of the Agreement and Ninth Amendment**

As set forth at length in Sections 1 through 5 above, Hynix did not use commercially reasonable efforts to meet the ▇▇▇▇▇ 2133 MHz chip minimum requirement and its other contractual obligations of the Agreement and Ninth Amendment.  On the contrary, Hynix repeatedly breached multiple terms of the Agreement and Ninth Amendment and acted in a completely commercially unreasonable manner as follows:

- Hynix failed to maintain a buffer inventory as a matter of law;

- Hynix failed to maintain a written disaster recovery plan as a matter of law;

- Hynix refused to give Microsoft ▇▇▇▇ allocation and instead allocated or "binned" 2133 MHz chips as lower speed chips of 1866 or 1600 and then allocated and sold those chips to other customers at higher prices;

- Hynix failed meet Microsoft's then current forecast and to reject any purchase orders from Microsoft despite the fact that it knew it could not or would not fulfill the purchase orders;

- Hynix failed to notify Microsoft of any capacity constraint prior to the fire despite claiming now that a capacity constraint already existed before the fire which was of its own making; and

- Hynix sold approximately ▇▇▇▇▇ 2133 MHz chips to Microsoft in the fourth quarter at an increased price per chip in violation of the Pricing Table in the Ninth Amendment as Microsoft was launching the Xbox One for the holiday season.

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

In addition, at the time of negotiating the Ninth Amendment with Microsoft, Hynix wanted to increase its market share with Microsoft across the spectrum of Microsoft's parts to over ███, which was a ten-fold increase from approximately ████████████. Hynix also now claims that when it offered Microsoft the preferential pricing terms for 2133 MHz chips for use in the Xbox One launch, that its supply of DRAM chips may come under strain and that the Xbox One's launch was of critical importance to Microsoft.  With this knowledge and against this background, Hynix made a business decision to offer favorable 2133 MHz chip pricing to Microsoft for the calendar year 2013.  The prices were such that Hynix encouraged Microsoft to submit purchase orders and forecasts for all its Xbox One 2133 MHz chip needs, a fact that was known to Hynix.  In a desperate attempt to create a defense to the allegations in this litigation, Hynix asserts that it anticipated a possible capacity constraint even prior to signing the Ninth Amendment and rather than tell Microsoft that Hynix was approaching a possible capacity constraint of its own making by overcommitting to its customers, Hynix demanded that a "commercially reasonable efforts" provision into the Ninth Amendment. To placate Microsoft's concerns about its supply of crucial 2133 MHz chips for the Xbox One launch, Hynix offered what it knew would be meaningless guarantees, namely ███████ allocation, buffer inventory and a disaster recovery plan.  Hynix also knew capacity *per se* was not the real supply problem, rather its plan to allocate 2133 MHz chips, that were only being ordered in substantial quantities by Microsoft, to other customers as 1866 MHz and 1600 MHz chips at higher prices, thereby making it an allocation issue, not capacity issue.

Hynix's lack of commercial reasonableness is further highlighted by its repeated evasions to direct questions from Microsoft following the fire regarding fulfillment of the terms of the Agreement and Ninth Amendment.  Hynix deliberately obfuscated the truth about its production, sales, and allocation practices all the while continuing to receive and never reject purchase orders from Microsoft for tens of millions of 2133 MHz chips.  Hynix also hid the

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

severity of the fire and its true impact on Hynix's operations and failed to organize a task force after the fire to focus on supplying Microsoft's 2133 MHz chip requirements. After the fire, Hynix indicated that the Wuxi fab clean room was not affected, yet Hynix subsequently submitted a claim to its property insurer seeking payment in the amount of ███████, including ████████ for machinery resulting from damages in and around the clean room.

The production and sales data and records are clear in establishing that Hynix had the production capability (approximately ████████ 2133 MHz chips in 2013) to meet not only the minimum capacity commitment of ███████ chips but also Microsoft's purchase orders for ████████ chips and its then current forecast for ████████ chips. However, rather than fulfill its contractual obligations, Hynix allocated and sold 2133 MHz chips to its other strategic customers at a higher price to obtain greater profit.

Finally, the commercially unreasonable behavior of Hynix is demonstrated through its internal communications between the sales group and the Hynix home office compared to communications with Microsoft. Following is just a sampling of the Hynix communications, including internal Hynix communications, which were never shared with Microsoft and are still not available to Microsoft given their Attorney's Eyes Only designation, that reveal a corporate culture of greed and unwillingness to honestly communicate with its launch partner customer:

1. Exhibit 8 is the ***only document*** that Hynix can identify to support its contention that Microsoft was notified prior to the September 4, 2013 fire that Hynix would not fulfill its contractual obligations in providing Microsoft with all 2133 MHz chips requested through Microsoft's forecasts and purchase orders. However, a simple reading of the document does not support Hynix's position. First, the July 9 email references a build plan and a backlog, which is the portion that Hynix desperately

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

clings to in an effort to support its contention; however, the remainder of the email is clear that no message was conveyed to Microsoft that Hynix would not fulfill its contractual obligations.  For example, within the same email, Steve Kaye of Hynix wrote "we are still ramping up and expect the yields to improve soon."  Moreover, on the following day, Mr. Kaye issued a subsequent build plan increasing the quantity of chips by ███████ chips and noting that "we are working to improve to meet the original POR."  Importantly, POR is Plan of Record, which is the Microsoft Forecast.  Clearly, Hynix cannot support its contention based on this communication.

2. Exhibit 6 is an email in which Hynix requested that Microsoft accept ███████ 2133 MHz chips earlier than when requested by Microsoft through its forecasts and purchase orders.  Microsoft confirmed a discussion with Paul Palonsky of Hynix noting "we understand that smoothing the build ramp will allow SK Hynix to commit to the full forecast through September (~ ████ pcs year to date)"  Significantly, Mr. Palonsky responded with "We will work on it."  Clearly, this cannot be considered notice to Microsoft that Hynix would not meet Microsoft's 2133 MHz chip needs.

3. Exhibit 62 is an internal email within Hynix dated September 26, 2013 (post-fire), in which Hynix addressed the "disconnect" between Microsoft's forecasts and purchase orders and Hynix's attempt to limit its obligations to ███████ chips.  Within the email, Hynix notes that PO's were "placed into system" (accepted) with no response from HQ.  It is also noted that the disconnect "is not an issue because of the Wuxi fire but communication back to the customer on Purchase orders needs to improve."  This email is a clear admission by Hynix that internally the Hynix headquarters were

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

not planning on meeting Microsoft's needs, but no information was ever provided to Microsoft.

4. Exhibit 73 is a Hynix internal email chain from August, 22, 2013 through September 4, 2013, in which a Hynix representative suggests to Hynix sales representative Steve Kaye that Hynix cancel various purchase orders issued by Microsoft.  Thereafter, another Hynix representative suggests that instead of canceling the PO that Hynix push out the backlog until the next month.  Kaye responds to the suggestion by stating "I would never ask them to cancel the POs."  Hynix then modifies its approach by noting that they need to "adjust" the POs.  Further, on September 3, 2013, the day prior to the fire, Kaye further writes within this internal Hynix email chain, "As far as Microsoft is concerned, we are going to support their POs", while also noting "I know you have been working to get more parts but can you please revisit and let me know the MAX number we can support as I need to let Microsoft know asap!" This internal communication demonstrates: 1) Hynix knew that Microsoft was not informed that Hynix would allegedly limit the quantity of 2133 MHz chips to ███████ lion; 2) Hynix had not informed Microsoft that it would not be able to meet Microsoft's forecasts and purchase orders; 3) Hynix knew that they were contractually obligated to meet Microsoft's forecasts and purchase orders; 4)  Hynix knew it had the ability to reject Microsoft's purchase orders, but chose to modify the delivery date on its own initiative without consultation with Microsoft; 5) Hynix had no intention of rejecting any of Microsoft's purchase orders; 6) Hynix never rejected any of Microsoft's purchase orders, despite Hynix's apparent internal belief that it could not timely fulfill the orders; and 7) Hynix had the ability to allocate more

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

DRAM chips as 2133 MHz chips for sale to Microsoft, but instead decided to allocate those DRAM chips to other customers as other speed grade DRAM chips.

These communications reveal not only Hynix's commercially unreasonable approach to its business dealings with Microsoft, but are also now the backbone for Hynix's purported defense that Microsoft "fraudulently" submitted an insurance claim to its carrier.  Hynix apparently expects this Court and the jury to believe that had Microsoft's insurers and reinsurers conducted a "proper investigation", they would have determined that Hynix's failure to supply the 2133 MHz DRAM chips to Microsoft had nothing to do with the September 4, 2013 fire, but instead were the result of a methodical and sinister corporate decision by Hynix to blatantly breach its contract with Microsoft, without any notice to Microsoft, while withholding its internal communications from Microsoft by marking virtually its entire document production as "Attorneys Eyes Only", thereby preventing Microsoft personnel from now viewing these materials.  It is disingenuous for Hynix to assert such a defense by claiming that it would have somehow shared its internal communications with Microsoft's insurers even though it has never been willing to make these same materials available to its valued, launch partner, Microsoft. This is an audacious attempt by Hynix to establish a non-existent defense that is flatly contradicted by the evidence.

As a result of the above, the unequivocal and overwhelming evidence establishes that Hynix acted commercially *unreasonably* as to each and every one of its contractual obligations that is the subject of this lawsuit.  As a result, Cypress is entitled to recover all amounts paid to Microsoft for the costs incurred in obtain DRAM chips, which is $97,714,236. *See New West Federal Savings and Loan Association*, 786 P.2d at 329-30.

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

### B.       Hynix's Affirmative Defenses Are Inapplicable

### 1.       Cypress was not a Voluntary Payor

The unequivocal evidence and law establishes that Cypress was not a voluntary payor and therefore can recover all of its cover damages as the subrogee of Microsoft.  In Washington, subrogation is the principle by which an insurer that has paid a loss under an insurance policy is entitled to *all* rights and remedies belonging to the insured against a third party as to any loss covered by the policy. *Mutual of Enumclaw Ins Co. v. USF Insurance Co.*, 191 P. 3d 866, 874 (Wash. 2008) (*emphasis added*).  Subrogation is favored in Washington and is "always liberally allowed in the interests of justice and equity." *Mahler v. Szucs*, 957 P.2d 632, 640 (Wash. 1998) (citation omitted). Subrogation is an equitable doctrine with the essential purpose of providing for proper allocation of payment responsibility. *Id.; see also Trinity Universal Ins. Co. of Kansas v. Ohio Casualty Ins. Co.*, 312 P.3d 976, 984-985 (Wash. App. 2013).

There are two features of subrogation: the right to reimbursement and the mechanism to enforce the right. *Id.*  The right to reimbursement may arise by operation of law, known as equitable subrogation, or by contract, known as contractual subrogation. *Id.*  Contractual subrogation is generally created by the insurance policy between the subrogating insurer and its insured, and may arise either expressly or impliedly from the policy.[4]  In either case, the subrogating insurer stands in the shoes of its insured to the extent of any payments made pursuant to the policy and can assert all claims and remedies, whether in tort, contract or otherwise, that its insured has against any party responsible for the loss. *Id.; see also* the Court's

---

[4] *See, inter alia,* 83 C.J.S. Subrogation § 11; *see also In re Corbin*, 506 B.R. 287, 294 (W.D. Wash. 2014); *In re Darosa*, 318 B.R. 871, 877 (9th Cir. 2004); *In re Hamada*, 291 F.3d 645, 649 (9th Cir. 2002); *Metro. Life Ins. Co. v. First Sec. Bank of Idaho*, 491 P.2d 1261, 1264 (Idaho 1971); *Martin v. Hickenlooper*, 59 P.2d 1139, 1141 (Utah 1936).

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Order of February 6, 2019 ECF No. 195, p. 7, citing *Bank of America, N.A. v. Prestance Corp.*, 160 P.2d 560, 576 (Wash. 2007)(applying liberal approach to equitable subrogation in mortgage lending context) & 73 Am. Jur. 2d Subrogation § 5 (noting the liberal application of equitable subrogation and explaining it includes every instance in which one person, not acting voluntarily, paid a debt for which another was primarily liable and should have been discharged by the latter); *see also Mutual of Enumclaw Ins Co.,* 191 P. 3d 866 at 874. The effect of assignment under Washington law is essentially the same. *Id.*

In addition, the Court noted that under Washington law, "[o]ne is a volunteer and not entitled to subrogation if, in making payment, he has no right or interest of his own to protect and acts without obligation, moral and legal, and without being requested to do so by a person liable on the obligations." (ECF No. 195, p. 7 citing *Hartford Ins. Co. v. Ohio Cas. Ins. Co.*, 189 P.3d 195, 200 (Wash. App. 2008)).

The Court has already stated that "Cypress put forth evidence showing the insurance adjusters determined the loss was covered under the Microsoft Policy and paid out based on that determination."  And, the Court took note of the fact that "After deciding that Microsoft's claim was covered, Cypress paid Microsoft for losses up to the policy limit of $150 million."  In this case, the unequivocal evidence and the Court's rulings establish that Cypress is not a voluntary payor and is subrogated to Microsoft to the extent of Cypress' payments for the loss.

Cypress insured Microsoft for contingent time element losses caused by the September 4, 2013 fire under Policy No. 1005.  Microsoft made a claim to Cypress in excess of the contingent time element sub-limit of $150 million for its contingent time element losses above Microsoft's $25 million deductible, resulting from the fire.  Microsoft's losses included cover damages to obtain substitute 2133 MHz chips from other suppliers because of Hynix's failure to provide the

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1   required 2133 MHz chips under the Agreement and Ninth Amendment as well as incremental

2   freight charges and additional costs.  Insurance professionals adjusted and paid the loss less

3   Microsoft's $25 million deductible because Microsoft's claim was covered under the Policy, a

4   fact previously noted by this Court.

5          Hynix's attempted argument that Cypress cannot recover for damages not caused by the

6   fire ignores all of the foregoing law on subrogation, the voluntary payment doctrine, as well as

7   the evidence.  "One is a volunteer and not entitled to subrogation if, in making payment, he has

8   no right or interest of his own to protect and acts without obligation, moral and legal, and

9   without being requested to do so by a person liable on the obligations." (ECF No. 195, p. 7

10  citing *Hartford Ins. Co.,* 189 P.3d at 200 (Wash. App. 2008)).  Moreover, an insurer's payment

11  is not voluntary simply because the insurer may have a defense to coverage.  *Hartford Ins. Co.,*

12  at 200.  To the contrary, "[i]f the insurer is subject to suit if it does not pay, . . . then it cannot be

13  said that the payment is voluntary, or that the right to recover contribution is lost." *Jacob's*

14  *Meadow Owners Association v. Plateau 44 II, LLC*, 139 Wash.App. 743, 768, 162 P.3d 1153

15  (2007) *citing Clow v. Nat'l Indem. Co*., 54 Wash.2d 198, 208, 339 P.2d 82 (1959); *see also*

16  *Newcomer v. Masini*, 45 Wash.App. 284, 289, 724 P.2d 1122 (1986)

17         The undisputed fact is that the loss was covered under the policy, and Cypress had a

18  contractual obligation to pay the claim.  What Hynix attempts to do is improperly re-adjust the

19  claim over five years after the loss in litigation in an attempt to parse out what damages were

20  allegedly covered or not covered by the policy, by reference to internal Hynix documents that

21  Hynix strategically decided to not provide to Microsoft in 2013 and continues to block from

22  Microsoft through designation of those documents as Attorney's Eyes Only protected

23  documents.  The Court essentially rejected this argument by Hynix on summary judgment (ECF

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

No. 195, pp. 6-7), and the argument is also contrary to well established Washington law requiring an insurance company to pay a claim that it determines was covered even if some of the damages were allegedly caused by excluded or uncovered events.

In this case, the fire indisputably triggered coverage under the Policy.  In fact, Hynix judicially admits that a significant number of 2133 MHz chips were not provided to Microsoft due to the September 4, 2013 fire.  This in and of itself defeats Hynix's defense.  Indeed, up to the time of the fire Hynix surreptitiously produced all of the 2133 MHz chips for Microsoft at the Wuxi fab, where the fire occurred, instead of at the Icheon fab, where the contract required those chips to be made. Moreover, Hynix admits the fire was significant and reduced the worldwide production of DRAM chips by 15%.  The fact that only three entities in the world had the capacity to make the grade DRAM chip required by Microsoft made this fire even more devastating to Microsoft.  Further, Hynix claimed approximately ███████ from its insurers as a result of the severity of the fire based on lost production due to the fire and an additional ███████ for property damages.

As a consequence, Cypress can base this action against Hynix on breach of contract claims because the fire caused the breach of contract for which Microsoft was reimbursed. The fire caused the underlying harm and reimbursement to Microsoft by Cypress as a result of the breach of the various provisions of the Agreement and Ninth Amendment. Indeed, the fire, as admitted by multiple Hynix employees, caused a worldwide shortage of DRAM chips with consequent price increases. Hynix failed to deliver the number of DRAM chips forecasted and ordered by Microsoft. In addition, the various contractual provisions such as the buffer inventory, Disaster Recovery Plan, and priority allocation in favor of Microsoft, were all crafted to enable Hynix to take steps to avoid a breach of contract that occurred by failing to adhere to

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

the contractual requirements.

Assuming, arguendo, that Hynix's breaches of contract or the damages flowing therefrom alleged by Cypress were otherwise excluded or not covered by the policy or not caused by the fire, which is not the case, Cypress still had the obligation to pay the claim for the damages due to Hynix's breaches of contract, which were precipitated by the clearly covered fire – a fact admitted by Hynix.  Because of the fire and Hynix's related breaches of contract, Hynix failed to provide the contracted for number of DRAM chips, causing Microsoft to secure alternate chip sourcing at a higher price.  These short-falls occurred after the fire.  Cypress reimbursed Microsoft for its contingent business interruption loss pursuant to the Policy, thereby permitting Cypress to pursue its subrogation rights against Hynix. *See Jacob's Meadow Owners Association, supra.*

Hynix's argument is a legally and factually improper attempt to circumvent the law of Washington regarding subrogation and is tantamount to having the jury decide which claims or damages were covered under Microsoft's policy with Cypress when in fact that is undisputedly an issue of law.  Succinctly put, Hynix's theories on the manner in which subrogation actions operate would negate subrogation in all cases as it would require the subrogee to establish coverage and to separate out covered and non-covered claims at a subrogation trial in every case in which an insurance company seeks to bring a claim against a wrongdoer for a claim in which it has paid.  Accordingly, because the evidence and law unequivocally establish Cypress' subrogation rights and its status as a non-voluntary payor, Hynix's voluntary payment affirmative defense does not apply.

### 2. The Commercial Impracticability Doctrine is Inapplicable

Hynix's breaches of the Agreement and Ninth Amendment are not excused by

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1  commercial impracticability because the fire was not an unexpected contingency.  The defense

2  of impracticability applies to excuse performance if an event is not foreseen or anticipated – a

3  "wholly unexpected contingency".  *Syrovy v. Alpine Resources, Inc.*, 841 P.2d 1279, 1283

4  (Wash. App. Div. 3 1992), *aff'd,* 859 P.2d 51 (Wash. 1993).  The fire was clearly not a "wholly

5  unexpected contingency" as the Parties' contemplated events such as fires in the Agreement as

6  Paragraph 12.1 for a Disaster Recovery Plan provides that the ███████████████████

7  ████████████████████████████████████████████████████ (*See* ECF No. 195, pp. 16-17).

8  

9  Fires at manufacturing facilities are foreseeable events and are not unexpected contingencies.

10  This is especially evident given the use of various hazardous gases in the fabrication process at

11  the Wuxi facility which presented, among other things, risk of fire and explosion.

12         In addition, impracticability cannot lie when a party, by its own conduct, creates the

13  event causing the impracticability of performance as the party must make all reasonable efforts

14  to avoid impossibility. *See Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245, 257

15  (N.D. Ill. 1974), *aff'd,* 522 F.2d 469 (7th Cir. 1975).  Hynix had two fabrication facilities, Wuxi

16  and Icheon, both of which could make the chips ordered by Microsoft.  The temporary loss of

17  one facility, Wuxi, did not make it impossible for Hynix to supply the 2133 MHz chips to

18  Microsoft.  In fact, the contract required Hynix to manufacture Microsoft's 2133 MHz chips at

19  the Icheon facility, where the fire did not occur.  Further, Hynix had the production capability

20  (approximately ██████████ 2133 MHz chips in 2013) to easily meet all of Microsoft's chip

21  needs and then some.  However, rather than fulfill its contractual obligations, Hynix allocated

22  and sold 2133 MHz chips to its other strategic customers at a higher price to obtain greater

23  profit.  Hynix's conscious decisions to maximize profits in deliberate breach of its contract, to

24  make Microsoft's chips at Wuxi where the fire occurred rather than at the contractually agreed

25  

26  

27  

28  CYPRESS' TRIAL BRIEF - 36

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

upon fab at Icheon, and to fail to have the required buffer inventory and written disaster plan for just such an event as the fire negates its defense of commercial impracticability.  As a result, the doctrine of commercial impracticability does not apply to excuse Hynix's non-performance of the Agreement and Ninth Amendment.

> ### 3.   Pre-Incident Conduct Is Not Relevant to Cypress' Breach of Contract Causes of Action

Microsoft's pre-incident conduct is not relevant to the breach of contract; therefore, Hynix's defense that Microsoft's own conduct caused its damages has no merit.  Hynix seeks to argue: 1) Microsoft did not have a "Contingency Plan" prior to the subject fire, i.e., Microsoft did not secure a secondary or alternative source of DRAM chips for the Xbox One prior to the subject fire; 2) Microsoft failed to follow its own product risk management plan prior to the subject fire; 3) Microsoft failed to build part (DRAM chip) and product (Xbox One) inventories prior to the subject fire; and 4) Microsoft untimely submitted Purchase Orders to Hynix for DRAM chips in excess of ███████ chips without written consent prior to the fire.  These defenses, however, relate to pre-incident conduct – conduct prior to the September 4, 2013 fire - which are not relevant to this sole breach of contract action. Moreover, comparative fault is not applicable in a breach of contract claim, and Microsoft did not breach any provision of the Parties' contract.

> ### 4.   Hynix's Unclean Hands Defense is Not Relevant to Cypress' Breach of Contract Causes of Action

Hynix's defense of unclean hands is not relevant and inapplicable to the evidence in the case.  The Court has ruled that as a matter of law Hynix breached the contract by failing to maintain a buffer inventory and by failing to maintain a Disaster Recovery Plan [ECF 195].  This ruling necessarily disposes of Hynix's unclean hands argument because the Court found that Hynix breached the contract on these two bases; therefore, Microsoft's hands are clean no

---

CYPRESS' TRIAL BRIEF - 37

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

evidence has suggested anything to the contrary.

As such, Hynix's affirmative defenses are inapplicable, and it is liable to Cypress for its multiple breaches of contract and commercially *unreasonable* conduct resulting in damages approximating $98 million.

## CONCLUSION

Hynix breached the Agreement and Ninth Amendment in multiple respects and did not use commercially reasonable efforts to supply the requisite number of 2133 MHz chips to Microsoft, despite the contractual obligation and Hynix's capability to do so.  Hynix's conduct was in complete disregard of its contractual obligations, the contractual rights of Microsoft and industry practice, and evidences a clear pattern and practice of commercial *unreasonableness* for which it is accountable.

Following the fire at the Wuxi fabrication facility, Hynix used anything but commercially reasonable efforts by failing provide 2133 MHz chips from its buffer inventory because it did not have one, by failing to provide 2133 MHz chips as set forth in its Disaster Recovery Plan because it did not have one, and by failing to provide Microsoft with priority allocation because it gave the same allocation to many other customers – all the while never informing Microsoft.

In addition, Hynix's defenses are disingenuous since they are based solely on internal Hynix communications that were never shared or expressed to Microsoft during the relevant periods and are still not accessible to Microsoft since Hynix has labelled all such communications as Attorney's Eyes Only.  It is evident that each and every "defense" claimed by Hynix has been created after the fact in an effort to escape liability for its blatant breaches of contract as reflected above and as acknowledged by this Court.

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Because of these breaches and Hynix's commercially *unreasonable* conduct and Hynix's

lack of any viable defenses, Microsoft incurred substantial damages of $97,714,253, exclusive of

interest, which Cypress, as Microsoft's subrogee, is entitled to recover.

DATED this 25th day of February, 2019.

COZEN O'CONNOR

By: /s/ Mark S. Anderson
    Mark S. Anderson, WSBA 17951
    999 Third Avenue
    Suite 1900
    Seattle, WA  98104
    Telephone: 206.340.1000
    Toll Free Phone: 800.423.1950
    Facsimile: 206.621.8783
    Email

    James B. Glennon (*Pro Hac Vice*)
    George D. Pilja (*Pro Hac Vice*)
    FORAN GLENNON PALANDECH
    PONZI & RUDLOFF PC
    222 North LaSalle Street, Suite 1400
    Chicago, Illinois 60601
    Phone: (312) 863-5000
    Facsimile: (312) 863-5099
    Email: jglennon@fgppr.com
    Email: gpilja@fgppr.com

    Diana R. Lotfi (*Pro Hac Vice*)
    FORAN GLENNON PALANDECH
    PONZI & RUDLOFF PC
    450 Newport Center Drive, Suite 630
    Newport Beach, California 92660
    Phone: (949) 791-1060
    Facsimile: (949) 791-1070
    Email: dlotfi@fgppr.com

    Attorneys for Plaintiff

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court

using the CM/ECF system which will send notification of such filing to the following:

Alex A. Baehr, WSBA No. 25320
Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, WA 98104-2682
alexb@summitlaw.com

Timothy B. Yoo, CA Bar No. 254332
Ekwan E. Rhow, CA Bar No. 174604
Jennifer C. Won, CA Bar No. 307807
Bird, Marella, Boxer, Wolpert, Nessim
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
tyoo@birdmarella.com
dchao@birdmarella.com
erhow@birdmarella.com

*Attorneys for Defendant*

Dated: this 25th day of February, 2019

*/s Renita Cook*

Renita Cook
Legal Assistant

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000